# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7095 | **DATE** | June 26, 2003 |
| **CASE TITLE** | *Mehringer v. Village of Bloomingdale* | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum and Order, this Court: (1)Grants the Defendant Village of Bloomingdale's Motion for Summary Judgment and Motion for Directed Verdict as to Count I of the Amended Complaint; (2) Grants the Defendant Village of Bloomingdale's Motion to Strike the Punitive Damages Award; (3) Grants in part and denies in part Plaintiff Shelly Mehringer's Post-Trial Fee Petition and taxes the Village $289,950 in attorneys' fees and $29,412.94 in costs; and (4) Denies Mehringer's Petition for Front Pay Damages.

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| RTS | courtroom deputy's initials | | mailing deputy initials | |

JUN 27 2003

CLERK U.S. DISTRICT COURT

03 JUN 26 PM 5: 15

FILED-ED-D 10

Date/time received in central Clerk's Office

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SHELLY MEHRINGER,                 )
                                  )
        Plaintiff,              )
                                    )      Hon. Blanche M. Manning
    v.                           )
                                    )      00 C 7095
VILLAGE OF BLOOMINGDALE           )
                                  )
        Defendant.              )

**DOCKETED**
JUN 2 7 2003

## MEMORANDUM AND ORDER

Plaintiff Shelly Mehringer brought this action against Defendant Village of Bloomingdale

("Bloomingdale" or "the Village") pursuant to Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000 et seq., alleging hostile environment sexual harassment, retaliation, and sexual

discrimination. After a jury trial, a verdict was returned in favor of Mehringer on all counts and

awarded her $50,000 in compensatory damages and $750,000 in punitive damages. The present

matter comes before the Court on Bloomingdale's Motion for Summary Judgment, Motion for

Directed Verdict, and Motion to Strike the Punitive Damages Award and Mehringer's Post-Trial

Fee Petition and Petition for Front Pay Damages.[1]

### BACKGROUND[2]

Bloomingdale employed Mehringer as a secretary for the Department of Village Services

from July 1988 to March 10, 2000. Except for her final work review, she performed her job in

accordance with the expectations of her employer throughout that period. Bloomingdale has a

---

[1]     The Motion for Summary Judgment, which was taken with the case, and the Motion for a Directed Verdict were ruled on at trial with a written ruling to follow.

[2]     The facts set forth in this background section are taken from the parties' Agreed Statement of Uncontested Facts and the testimony presented at trial.

written policy prohibiting sexual harassment, which Mehringer received before she started working. This policy states "all allegations of [sexual harassment] will be thoroughly investigated, promptly and as confidentially as possible." Employees are instructed to report any perceived sexual harassment to their department head, who "shall promptly, but thoroughly, investigate the complaint," and "shall immediately notify the Village Administrator in a confidential manner." Within ten working days of receiving the employee's complaint, the department head is required to complete an investigation and make a written reply to the employee.

During her employment with the Village, Mehringer had a romantic relationship with James Monikemeyer, who also worked for Bloomington, as an administrative assistant for Michael Marchi, the director of the Department of Village Services. Marchi was also the person to whom Mehringer's immediate supervisor, Robert Prohaska, reported.

Mehringer's relationship with Monikemeyer lasted a total of two months, a month in late 1993 or early 1994 and a month in the fall of 1997. Mehringer testified that she ended the relationship with Monikemeyer in 1997 because she became engaged to marry Ray Mehringer. According to Mehringer, Monikemeyer became very upset upon hearing this news. She testified that he told her that they "belonged together" and that she "should be marrying him not Ray." (Tr. 92-93.)

After ending their relationship, Mehringer testified that Monikemeyer began a campaign of harassment, which became more aggressive over time, to win her back. At first, according to Mehringer, Monikemeyer simply expressed his desire to rekindle their relationship and asked whether there "was any chance that [they] could get back together." (Id. at 101.) Monikemeyer's conduct, however, escalated when on Valentines Day of 1999, he sent flowers to her home, in an

"attempt to ruin her weekend" and "breakup [her] marriage to Ray." (Id. at 103.) Monikemeyer also told her that he knew where she lived after he spent several hours over the weekend searching for her home. (Id. at 103-04.) Although disturbed by this conduct, Mehringer testified that she "thought it was an issue outside of work that she could handle on her own." (Id. at 104.)

Unfortunately for Mehringer, Monikemeyer's conduct only grew worse. He began following her around the office and calling her extension at work and telling her that "we definitely belong together. He couldn't imagine being with anybody else. He no longer understood why I stayed with Ray, and if I would just meet with him one more time, he could show me why it was that I needed to be with him." (Id. at 105-06.) He also began to follow Mehringer after work in his car. (Id.)

The harassing conduct apparently came to a head in November of 1999. Monikemeyer began to constantly follow her around at work, and when she again rebuffed his romantic proposals, he began threatening her, making obscene gestures, and using profanity, including calling her a "f-ing bitch." (Id. at 112, 123-25.) Finally, Mehringer reported these actions to her immediate supervisor and to Monikemeyer's boss. Unfortunately, Monikemeyer's conduct continued, and therefore, Mehringer continued to make complaints. Contrary to the Village's written policy, however, the supervisors did not issue Monikemeyer a written warning or conduct an official investigation. Instead, they referred Mehringer and Monikemeyer to the Employee Assistance Program ("EAP") to resolve the problem.

The EAP mediation, however, did not resolve the situation and Monikemeyer's conduct persisted. To make matters worse, Mehringer's 2000 review was lowered one point because "[u]nfortunately, there is a tense atmosphere in the Village services Department affecting the normal assignment of work. This matter does involve Shelly and needs to be rectified in the near

3

future to allow the office to function normally." (Agreed Facts at ¶ 19.) This one point drop in her score resulted in Mehringer receiving a lower raise than she would have otherwise. In contrast, Monikemeyer, did not receive a negative performance evaluation and was even promoted and received a raise.

Finally, Mehringer left her position on March 10, 2000 because: (1) she was unable to endure Monikemeyer's continuing harassment; and (2) Bloomingdale had not responded to her repeated complaints and punished her for complaining of the harassment while promoting the alleged harasser.

Upon leaving her position, Mehringer filed an EEOC complaint. After receiving a right to sue letter, Mehringer filed the instant action alleging hostile environment sexual harassment (Count I) and retaliation (Count II) in violation of Title VII, and breach of contract (Count III) on the theory that Bloomingdale's sexual harassment policy created a contractual obligation. On September 18, 2001, this Court denied Bloomingdale's Motion to Dismiss Counts I and II, but granted it as to Count III. Mehringer then amended her complaint adding a charge of sexual discrimination based on the alleged disparate treatment to which she was subjected after complaining of the alleged harassment. In response, Bloomingdale filed a Motion to Dismiss the sexual discrimination claim, which this Court denied.

On the eve of trial, the Village moved for summary judgment on the grounds that Monikemeyer's conduct was not based on sex. Instead, according to Bloomingdale, assuming that his harassing conduct actually occurred, it was motivated not by gender but by a "failed relationship," and therefore, did not fall under the protections of Title VII. The Court took the motion for summary judgment with the case and proceeded to trial. After the close of Mehringer's case in chief, the Village moved for a directed verdict on the same grounds as in its

4

summary judgment motion. At the close of evidence, the Court denied both of these motions but state that it would issue a written opinion at a later date.

At the conclusion of the trial, the jury returned a verdict in favor of Mehringer on all counts and awarded her $50,000 in compensatory damages and $750,000 in punitive damages. The present matter comes before the Court on Bloomingdale's Motion for Judgment Notwithstanding the Verdict [???] and Motion to Strike the Punitive Damages Award and Mehringer's Post-Trial Fee Petition and Petition for Front Pay Damages.

## ANALYSIS

### I.     Motions for Summary Judgment and Directed Verdict.

At the close of evidence, but before the case went to the jury, this Court denied the Village's Motion for Summary Judgment, which was taken with the case, and Motion for Directed Verdict. After further review of the relevant evidence and the law, however, this Court finds that it should have entered judgment on Mehringer's claim for hostile environment sexual harassment (Count I).

Before discussing why judgment is appropriate on Count I, this Court will review the standard for determining a motion for summary judgment and motion for directed verdict. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). See also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23; Cheek v. Western & Southern Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994). A genuine issue of material fact is one that might affect the outcome of the lawsuit, and factual disputes that are irrelevant will not be considered. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether a

5

genuine issue of material fact exists, the court must construe the alleged facts in a light most favorable to the party opposing the motion. U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962); Dale v. Chicago Tribune Co., 797 F.2d 458, 460 (7th Cir. 1986).

The moving party carries the initial burden of establishing that no genuine issue of material fact exists. Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 323. Once the moving party has met its burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Becker v. Tennenbaum Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir. 1990). The nonmoving party must do more than "show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and may not merely rest upon the allegations or denials in its pleading, but instead must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248. If the evidence presented is "merely colorable" or is not "significantly probative," summary judgment may be granted. Id. at 250-51 (citations omitted). The court considers the record as a whole, and draws all reasonable inferences in the light most favorable to the nonmoving party. Regner v. City of Chicago, 789 F.2d 534, 536 (7th Cir. 1986).

Courts are cautious in granting summary judgment in employment discrimination cases because often issues of intent and credibility are involved. Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir. 1993); McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 370-71 (7th Cir. 1992). Summary judgment is inappropriate if the court must balance conflicting indications of motive and intent. Stumph v. Thomas & Skinner, Inc., 770 F.2d 93, 97 (7th Cir. 1985). An employer can only prevail at the summary judgment stage if the record shows that a reasonable trier of fact must conclude that the employment decision was not based on discrimination. Veprinsky v. Fluor Daniel, Inc., 87 F.3d 881, 893-94 (7th Cir. 1996).

The standard for a motion for a directed verdict under Rule 50(a), which requires the court to grant the motion only if "there can be but one reasonable conclusion," "mirrors" the motion for summary judgment. United Food Commercial Workers Union Local 700 v. Kroger Co., 132 F. Supp. 709, 711(N.D. Ind. 2001). In deciding a directed verdict motion, the court must examine the evidence presented at trial and not weigh the evidence but draw all factual inferences in favor of the non-moving party. Lytle v. Household Manuf., Inc., 494 U.S. 545, 554 (1990).

The Village contends that judgment was appropriate on all of Mehringer's claims because the evidence does not show that Monikemeyer's harassment was "inspired by or based upon her gender as required under Title VII." Rather, the Village asserts that, even construing the evidence in her favor, the testimony presented at trial leads to only one conclusion – that Monikemeyer's harassment was based upon animosity stemming not from Mehringer's gender but on their prior failed relationship and/or a desire to rekindle their relationship. In response, Mehringer contends that the fact she and Monikemeyer had a prior romantic relationship does not preclude her from bringing a claim for sexual harassment.

After reviewing the relevant case law, this Court finds while a prior romantic relationship does not preclude a plaintiff from bringing a sexual harassment claim based on conduct by the former girl/boyfriend, Meritor Savings Bank v. Vinson, 477 U.S. 57, 68 (1986), the plaintiff must still show that the harassment was based on gender and not based upon animosity stemming from the prior "failed relationship." Galloway v. General Motors Serv. Parts Operations, 78 F.3d 1164, 1168 (7th Cir. 1996). See also Huenschen v. Dept. of Health and Social Servs., 716 F.2d 1167, 1171 (7th Cir. 1983); Succar v. Dade Co. Sch. Bd., 229 F.3d 1343, 1345 (11th Cir. 2000); Kaminski v. Freight-A-Ranger, 2002 WL 31174461, at *4-5 (N.D. Ill. Sept. 30, 2002).

7

In Galloway, 78 F.3d at 1165, the plaintiff brought an action against her employer alleging that a co-employee, with whom she had a prior romantic relationship, sexually harassed her by repeatedly calling her a "sick bitch." Affirming the district court's grant of summary judgment in favor of the employer, the Seventh Circuit held that the facts showed that the co-employee did not harass the plaintiff "on the basis of her sex." Id. at 1168. Instead, the inappropriate conduct occurred "in the context of a failed sexual relationship," and the conduct "reflected . . . a personal animosity arising out of the failed relationship rather than anything to do with" the plaintiff being a woman. Id.

In reaching this decision, the Galloway court relied on its decision in Huenschen, 716 F.2d 1167. The plaintiff in Huenshen brought an action against his former employer alleging that he was sexually discriminated and harassed by his former supervisor, with whom he had a romantic relationship. Id. at 1168-69. Reversing a verdict against the employer, the court found that the evidence failed to show that the supervisor, whom the plaintiff had dated and recommended that he be fired, acted out of any animosity based on the plaintiff's gender. Id. at 1172. Instead, the court found that the supervisor's conduct was motivated by the fact that the plaintiff was her "former lover who had jilted her." Id. Also, the court noted that there was no evidence the supervisor "discriminated against other men in the office or attempted to have romances with other men in the office." Id.

Similarly, in Kaminski, 2002 WL 31174461, at *1-3, the plaintiff brought an action alleging hostile work environment based on alleged sexual harassment by her former supervisor, with whom she had a "dating relationship." Granting the employer's motion to dismiss, the court noted that the supervisor's actions were "reprehensible and perhaps actionable" but not actionable under Title VII because she did not show that the supervisor's harassing conduct was

8

based on her gender. "There is no evidence indicating that [the male supervisor's] hostility toward [the plaintiff] was motivated by anything other than personal animosity arising from the failure of their relationship." Id. at *4. Therefore, the court found that the plaintiff failed to allege a hostile environment claim under Title VII. Id.

Here, upon further review of the evidence, this Court finds that, construing the evidence in Mehringer's favor as is required, the testimony presented at trial leads to only one reasonable conclusion – that Monikemeyer's harassment was based upon animosity stemming not from Mehringer's gender but from their prior failed relationship and/or his desire to rekindle their relationship. Mehringer and Monikemeyer were romantically involved for two months – a month in late-1993/early-1994 and a month in the fall of 1997. Mehringer testified that when she ended the relationship the second time, she told him that she "loved" Ray Mehringer and had decided to marry him. Upon hearing this news, Monikemeyer became "very upset" and stated that they "belonged together" and that she "should be marrying [him] not Ray." (Tr. at 92-93.)

Mehringer testified that after she refused to resume their relationship Monikemeyer began a campaign of harassment, which became more aggressive over time, to win her back. At first, according to Mehringer, Monikemeyer simply expressed his desire to rekindle their relationship and asked whether there "was any chance that [they] could get back together." (Id. at 101.) Monikemeyer's conduct, however, escalated when on Valentines Day of 1999, he sent flowers to her home, in an "attempt to ruin her weekend" and "breakup [her] marriage to Ray." (Id. at 103.) Monikemeyer also told her that after spending several hours over the weekend searching for her and Ray's home, he now knew where she lived. (Id. at 103-04.) Although disturbed by this conduct, Mehringer testified that she "thought it was an issue outside of work that she could handle on her own." (Id. at 104.)

Monikemeyer's conduct, however, grew worse. He began following her around the office and calling her extension at work and telling her that "we definitely belong together. He couldn't imagine being with anybody else. He no longer understood why I stayed with Ray, and if I would just meet with him one more time, he could show me why it was that I needed to be with him." (Id. at 105-06.) He also began to follow Mehringer to her car after work. (Id.)

In November of 1999, Monikemeyer began to constantly follow her around at work, and when she again rebuffed his romantic proposals, he began threatening her, making obscene gestures, and using profanity, including calling her a "f-ing bitch." (Id. at 112, 123-25.) Finally, Mehringer reported these actions to her immediate supervisor and to Monikemeyer's boss. Unfortunately, Monikemeyer's conduct continued, and therefore, Mehringer continued to make complaints.

Although Monikemeyer's conduct was certainly reprehensible and most likely actionable both civilly and criminally for stalking, the above actions and Mehringer's characterization of the conduct demonstrates that Monikemeyer's harassment was based upon animosity stemming not from Mehringer's gender but from their prior failed relationship and/or his desire to rekindle their relationship. In her testimony both at her deposition and at trial, Mehringer testified that Monikemeyer's conduct was based upon his animosity at being jilted and learning that Mehringer was going to marry someone else. (Tr. 213.) There was no evidence that Monikemeyer's conduct was motivated by anything else, let alone the fact that Mehringer is a woman. Moreover, there was no evidence that Monikemeyer treated other women employees in a similar manner or attempted to date other women working at the Village. Construing the evidence in Mehringer's favor as is required, the Court thus finds that the testimony presented at trial leads to only one reasonable conclusion – that Monikemeyer's harassment was based upon animosity stemming

not from Mehringer's gender but from their prior failed relationship and/or his desire to rekindle their relationship. Therefore, upon further review of the relevant law and the evidence, this Court finds that it should have granted the Village's motion for summary judgment and motion for directed verdict as to Mehringer's claim for hostile environment (Count I) because the harassment was not based on her gender and therefore, is not actionable under Title VII.

This determination, however, does not dispose of Mehringer's action because she still has a claim for retaliation and a claim for sexual discrimination. Even though the harasser's conduct was not based on sex, a plaintiff may still have a valid claim for retaliation if she believed that she was "opposing an unlawful practice." Kaminski, 2002 WL 31174461, at *6-7 (granting motion to dismiss as to harassment claim because not based on sex but denying motion as to retaliation claim).[3] Because the Village has not addressed or briefed how Mehringer's failure to prove harassment based on gender affects Mehringer's two other claims (retaliation and discrimination), the Court will let the jury verdict stand as to Mehringer's claims for retaliation and sexual discrimination.

## II.    Motion to Strike the Punitive Damages Award

During the jury instruction conference, this Court found that Bloomingdale had waived its right to assert the defense that it is immune from punitive damages because it failed to timely raise immunity from punitive damages as an affirmative defense. Subsequently, the jury awarded Mehringer $750,000 in punitive damages. The Village now moves to strike the punitive damage award on the grounds the Court should not have given the instruction for punitive damages

---

[3]    To plead a claim of retaliation, a plaintiff must allege that: (1) she complained about conduct that is prohibited by Title VII; (2) she suffered an adverse employment action; and (3) the adverse employment action was caused by her opposition to the unlawful employment practice. Spearman v. Ford Motor Co., 231 F.3d 1080, 1086 (7th Cir. 2000).

because: (A) section 1981a(b)(1) does not permit the award of punitive damages against a government entity, and therefore, the Village did not need to raise it as an affirmative defense; and (B) even if section 1981a(b)(1) is not an absolute bar to punitive damages, Mehringer did not seek punitive damages in her Amended Complaint, so Bloomingdale did not waive its right to assert immunity by not asserting it in its answer. The Court will discuss these contentions in turn.

Under section 1981a(b)(1), a plaintiff in a Title VII action may recover punitive damages. EEOC v. Waffle House, Inc., 534 U.S. 279, 287 (2002). Specifically, section 1981a(b)(1) provides that: "[a] complaining party may recover punitive damages . . . against a respondent (other than a government, government agency, or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."

In arguing whether section 1981a is a complete bar to punitive damages or simply an immunity defense which may be waived, both parties rely on the Supreme Court's seminal decision in City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981). The plaintiff in City of Newport brought a section 1983 action against the city seeking compensatory and punitive damages. Id. at 252-53. Without objection, the district court gave the jury a punitive damages instruction, resulting in an award of $200,000 in punitive damages against the city. Id. Reversing the decisions of the trial court and circuit court not to strike the award, the Supreme Court, after carefully considering the history of governmental immunity and the passage of section 1983, held that "a municipality is immune from punitive damages under 42 U.S.C. § 1983." Id. at 271. In arriving at this holding, the court did not determine that section 1983 was a

12

complete bar to punitive damages, only that it "incorporate[d] a particular immunity defense." Id. 259.

Relying on City of Newport, the Seventh Circuit has held that "[a]s a general rule, local public entities are immune from punitive damage awards in civil rights actions," but that the "local governmental entity" may waive its immunity for liability for punitive damages. Kolar v. County of Sangamon, 756 F.2d 564, 567 (7th Cir. 1985). In Kolar, the court affirmed the award of punitive damages against the local governmental entity on the grounds that Illinois state law waived the local municipality's immunity from punitive damage awards. Id.

Consequently, based on City of Newport and Kolar, this Court finds that section 1981a is not a complete bar to punitive damages but rather an immunity defense, which local governmental entities may waive. Thus, the question remains as to whether section 1981a's immunity defense is an affirmative defense which must be timely asserted under Federal Rule of Civil Procedure 8(c).

While neither the Supreme Court nor the Seventh Circuit have addressed this issue, the First Circuit and at least one court in this district have held that immunity is an affirmative defense which is waived if not timely raised under Rule 8(c). In Chestnut v. City of Lowell, 305 F.3d 18, 19 (1st Cir. 2002), the trial court, without objection, gave the jury a punitive damage instruction, resulting in an award of $500,000 in punitive damages against the city. On appeal, the city claimed the instruction was improper because it was immune from liability under City of Newport. Id. In a concurring opinion, reversing the award, the circuit judge noted that under City of Newport, the Supreme Court did not hold that punitive damages are unavailable, but rather only that municipalities are immune from damages. Id. at 22. Noting the significance of this distinction, the judge then noted that "[i]immunity . . . is an affirmative defense which can

be forfeited, if not asserted in a timely manner, or waived." Id.

Similarly, in Niebur v. Town of Cicero, 212 F. Supp. 2d 790, 799 (N.D. Ill. 2002), a former employee brought a section 1983 action against a city and its administrators seeking compensatory and punitive damages. During the jury instruction conference, the mayor of the city contended that she was entitled to statutory immunity under Illinois law because her alleged improper actions were performed in her official capacity. Id. 819. The court, however, refused to allow the mayor to assert the defense of statutory immunity because it was waived by not being raised until the submission of the jury instructions. Id. According to the court, statutory immunity is an affirmative defense under Rule 8(c), which should have been raised in the answer. Id. at 20. The court noted that it had the discretion under Rule 15(a) to allow the defendant to amend its answer to include the affirmative defense. Id. The court, however, declined to do so because it found that the defense was "reasonably apparent" long before the beginning of trial and that it would be improper to allow the defendant to "ambush" the plaintiff with an unexpected defense on the eve of trial. Id.

Accordingly, this Court finds that immunity to punitive damages is an affirmative defense which must be timely raised by the defendant. This, however, is not the end of the inquiry. The Court must now determine whether the Village waived this defense by not asserting it in its answer.

In a typical civil rights action against a governmental entity, a plaintiff specifically requests punitive damages against a municipality in its prayer for relief. The government entity, alerted by the specific request, then moves to timely strike the request for punitive damages, which the court grants as a matter of course because under City of Newport "[m]unicipalities are immune from punitive damages under the civil rights laws." Burns v. Ciniplex Odenon, 1996

WL 501742, at *12 (N.D. Ill. Sept. 3, 1996)(striking request for punitive damages against a city under City of Newport); Adams v. City of Chicago, 865 F. Supp. 445, 447 (N.D. Ill. 1994)(same); Gamboa v. Washington, 1987 WL 11376, at *4 (N.D. Ill. May 19, 1987)(same).

Here, in contrast to the usual civil rights case seeking punitive damages against a municipality, Mehringer did not specifically request punitive damages against the Village in its prayer for relief in either its Complaint or Amended Complaint. Therefore, because Mehringer did not specifically request punitive damages, Bloomingdale contends that it was not required to raise section 1981a immunity as an affirmative defense.

Mehringer contends that although it did not specifically request punitive damages in its prayer for relief, the Village was on notice that it was seeking punitive damages because its Complaint and Amended Complaint alleged that Bloomingdale's actions were "willful, wanton, malicious, outrageous and in total disregard and reckless indifference to Mehringer's civil rights" and sought damages "and other further relief as the Court deems just and appropriate."

A prayer for relief is governed by Rule 8(a)(3), which requires that a plaintiff must make "a demand for judgment for the relief [it] seeks." The demand for judgment, however, is not considered part of the plaintiff's claim for relief and the failure to request specific relief will not bar that relief if it is supported by allegations in the body of the complaint. See Wright & Miller, Federal Practice and Procedure: Civil 2d §1255 (1990).

Here, although Mehringer's Complaint and Amended Complaint tracked the language of section 1981a, it did not specifically request an award of punitive damages. Given the long-standing rule that municipalities are immune from punitive damages in civil rights actions, the Court is not willing to punish the Village for not raising the affirmative defense of immunity where such a request was not specifically requested in the complaint. Indeed, the first time

15

Mehringer specifically requested punitive damages, in the Pretrial Order, the Village timely objected to this request.

Moreover, even if the Court found that the facts alleged in the Complaint and Amended Complaint required the Village to plead an affirmative defense or object to punitive damages, Rule 15(a) vests this Court with discretion to allow Bloomington to amend its answer to assert an affirmative defense of immunity. See Sterling v. Riddle, 2000 WL 198440, at *4 (N.D. Ill. Feb. 11, 2000) (a defendant may "belatedly" assert affirmative defenses in an amended answer if it meets the requirements of Rule 15(a)). Rule 15(a) provides that "leave shall be freely given when justice so requires." Courts have interpreted Rule 15(a) to permit litigants to "freely amend[] or constructively amend[] [pleadings] as the case develops, as long as amendments do not unfairly surprise or prejudice the defendant." Umar v. Johnson, 173 F.R.D. 494, 503 (N.D. Ill. 1997). "As a rule," the Seventh Circuit allows a defendant to amend its answer to assert additional affirmative defenses if the plaintiff had "adequate notice [of the affirmative defenses] and had adequate opportunity to respond to it despite the defendant's tardy assertion." Jackson v. Rockford Hous. Auth., 213 F.3d 389, 392-93 (7th Cir. 2000). Rule 15(a), however, is not without limitation. An amendment may be denied if there is "undue delay, bad faith or dilatory motive on the part of the movant, . . . [or] undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." Foman v. Davis, 371 U.S. 178, 182 (1962). See also Jackson, 213 F.3d at 392-93 (amendment of an answer should not be allowed if it will cause the plaintiff "undue surprise or prejudice").

Here, Mehringer's only argument that the Village was barred from asserting its affirmative defense of immunity is that it was not timely filed. As discussed above, however, simply because the motion to amend is untimely does not mean that it is precluded. Mehringer

must show that the amendment of the answer will cause it "undue surprise or prejudice." Jackson, 213 F.3d at 392-93. Mehringer, however, has failed to show, either during the pretrial proceedings or now, how it would be prejudiced by the amendment.

Accordingly, upon further review of the facts, this Court finds that the jury should not have been given a punitive damage instruction because the Village did not waive its right to assert its statutory right of immunity from punitive damages. The Court thus strikes that jury's award of $750,000 in punitive damages against the Village.

## III.    Petition for Fees and Costs

As the prevailing party, Mehringer seeks attorneys' fees in the amount of $605,000 and $34,307.02 in costs associated with the preparation and trial of this case and the post-trial motions. The Village has objected to both the request for fees and costs on the grounds that they are unreasonable and excessive. The Court will first discuss the fees and then the costs.

### A.    Attorneys' Fees

Title VII provides that "[i]n any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee (including expert fees) as part of the costs." 42 U.S.C. § 2000(e-5)(k). Here, there is no dispute that Mehringer is the prevailing party because she succeeded at trial on significant issues in litigation. Hensley v. Eckerhart, 461 U.S. 424, 433, (1983); Dunning v. Simmons Airlines, Inc., 62 F.3d 863, 872 (7th Cir.1995); Bigby v. City of Chicago, 927 F.2d 1426, 1429 (7th Cir.1991).

The parties, however, disagree on the rate charged and the number of hours billed. Mehringer's attorneys, Best, Vanderlaan, & Harrington ("the Best Firm") seeks $605,000 in fees which they arrived at by multiplying 1,210 hours billed by a rate of $250 per hour and applying a multiplier of 2.0.

The "most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley, 461 U.S. at 433. The result is commonly referred to as the "lodestar." Id. The party seeking the award bears the burden of proving the reasonableness of the hours worked and the hourly rates claimed. Spegon v. Catholic Bishop of Chicago, 175 F.3d 544, 550 (7th Cir.1999). The lodestar amount then can be reduced or increased in consideration of a number of factors based on:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Hensley, 461 U.S. at 441.

When determining the number of hours reasonably expended in the litigation, the court must ensure that counsel exercised "billing judgment," that is, it must allow only such fees that would normally be billed to a paying client. Spegon, 175 F.3d at 553. In determining the reasonable hourly rate, the court must determine the "market rate" for the services rendered, that being the "rate that lawyers of similar ability and experience in the community normally charge their paying clients for the type of work in question." Id. at 555. The burden is on the party seeking fees to establish the market rate. Id. at 554-55. To establish the market rate, an attorney may submit an affidavit stating that the attorney has been awarded comparable rates in similar cases. See People Who Care v. Rockford Bd. of Ed., Sch. Dist. No. 205, 90 F.3d 1307, 1312 (7th Cir. 1996). Once the plaintiff's attorney puts forth appropriate evidence of a reasonable rate, the burden shifts to the defendant to "present evidence establishing a good reason why a lower

rate is essential." Id. By failing to present evidence of a lower rate, the defendant "essentially" concedes the claimed rate should be awarded. Id.

Here, the Best Firm has submitted affidavits from its two attorney's who tried this case and billed the majority of the hours, attesting that they have been awarded a rate of $250 per hour in several employment discrimination cases in this district. The Village contends that these affidavits are not sufficient because they do not list the names of the cases where they were awarded this rate. In response, the Best Firm contends that it did not list the names of these cases because they are subject to confidential settlement agreements but would be willing to submit proof of these awards for in camera review. The Court finds that the sworn affidavits are sufficient proof that $250 per hour is a reasonable market rate for the Best Firm.

Next, the Village objects to the use of a 2.0 multiplier. The Best Firm, contends that it is entitled to a 2.0 multiplier based on the fact that there was a risk that it would not be paid for their time because the firm took this case on a contingency basis. Courts are permitted to multiply a fee award if the case involved exceptional circumstances or there was a substantial risk that the prevailing party would not prevail in the case. Cook v. Niedert, 142 F.3d 1004, 1015 (7th Cir. 1998). Here, the Best Firm has not put forth any evidence to show that this case was any different than the typical employment discrimination case. Therefore, this Court will not apply a multiplier to the fees.

Bloomingdale additionally contends that the total number of hours charged by the Best Firm are unreasonable because many of the hours billed were duplicative, not related to this case, vague, and excessive.[4] A court may reduce the hours billed for being unreasonable if the court

---

[4] After the parties conducted a Local Rule 54.3 conference, they reached an agreement as to some of the issues. With respect to the alleged unrelated entries, the Best Firm agreed to only claim 2.6 of the 5.8 hours in dispute. Also, the Best Firm agreed to deduct 1.7 hours for

finds that the fees are inefficient, duplicitous, or inadequately documented. <u>People Who Care</u>, 90 F.3d at 1314.

With regard to duplicative entries, the Court has reviewed the entries which the Village contends are duplicative and except for the attendance at some of the depositions by two attorneys, the Court does not see how they are duplicative. The attendance at trial by two attorneys, both of whom participated in the trial of the case, is not unreasonable. However, the Court finds that it was duplicative and unnecessary for the Best Firm to have more than one attorney attend a deposition. Therefore, the Court will reduce the hours billed by 21.1 hours for having more than one attorney attend any one deposition.

The Village also lists a litany of time entries which it contends are vague and excessive. Bloomingdale, however, has failed to detail exactly how these entries are vague and/or excessive. After carefully reviewing these contested entries, the Court finds that the following entries billed for routine court appearances and filings are excessive:

- No. 132     File two motions     1.2
- No. 449     Filing motions with court and delivering to judge's chambers     1.1
- No. 587     Attend Status  4.0
- No. 680     Attend motion for substitution     4.0
- No. 730     Attend motion to dismiss and status  4.0
- No. 755     Attend Court regarding motion to continue pretrial   4.2
- No. 853     Attend status   3.8
- No. 985     Attend Defendant's Motion for entry of Motion for Summary Judgment 4.0

The Court finds that the filing of motions should not be billed as attorney time and that the Best Firm could have sent attorneys from its Chicago office to attend statuses and routine motions, instead of having attorneys drive in from Wheaton, a Western suburb of Chicago. Therefore, the Court will reduce the time hours by 22 hours based on the above entries being excessive.

---

observation of the trial. Therefore, the Court will deduct 4.9 hours from the total hours billed.

Additionally, the Court finds that the following entries are either vague and/or unnecessary:

- No. 13       Miscellaneous phone calls regarding Charge of Discrimination      .3
- No. 61       Verify date of complaint       .4
- No. 69       Miscellaneous phone calls       .4
- No. 72       Miscellaneous phone calls regarding EEOC  .3
- No. 74       Review file to verify service  .2
- No. 77       Review file     .2
- No. 78       Review file for current status .2
- No. 542     Review file regarding status hearing . 2

Because the above entries are so vague as to make it impossible for the Court to determine what value they added to the case, if any, the Court will subtract 2.2 hours from the total amount billed.

In conclusion, the Court will subtract 50.2 from the 1,210 hours which the Best Firm billed, which results in 1,159.8 hours of compensable time, which multiplied by $250 per hour equals $289,950 in attorneys' fees.

### B.    Costs

The Best Firm additionally seeks to recover $34,307.02 in costs. The Village objects to $1,435.34 in copying charges, $2,453.74 in lodging charges during the trial, and several other expenses which it contends are vague and unreasonable.

Rule 54(d) provides that "[c]osts . . . shall be allowed as of course to the prevailing party unless the court otherwise directs." Fed. R. Civ. P. 54(d). Recoverable costs include: (1) fees of the clerk; (2) fees for transcripts; (3) fees for printing and witnesses; (4) fees for copies of papers necessarily obtained for use in the case; (5) docket fees; and (6) compensation of court appointed experts and interpreters. 28 U.S.C. § 1920. Rule 54(d) creates a strong presumption favoring the award of costs to the prevailing party. Weeks v. Samsung Heavy Indus. Co., Ltd., 126 F.3d 926,

945 (7 th Cir.1997). "The presumption is difficult to overcome, and the district court's discretion is narrowly confined--the court must award costs unless it states good reasons for denying them." Id.

With respect to copying charges, "only photocopying charges attributable to discovery and the court's copies of pleading motions, and memoranda . . . can be awarded." AA Sales & Assocs., Inc. v. JT&T Products Corp., 2001 WL 855867, at *2 (N.D. Ill. July 27, 2001). Copies of court filings for a party's personal use, extra copies of filed papers and correspondence, and copies of cases are not recoverable. Id. See also Haroco v. American Nat'l Bank & Trust of Chicago, 38 F.3d 1429, 1441 (7th Cir.1994); McIlveen v. Stone Container Corp., 910 F.2d 1581, 1584 (7th Cir.1990). "Although the prevailing party is not required to submit a bill of costs so detailed as to make it impossible economically to recover photocopying costs, where a court is unable to determine whether the copies in question were reasonably necessary for use in the case, the claim for costs should be denied." American Auto. Accessories v. Fishman, 991 F. Supp. 995, 997 (N.D. Ill. 1998). See also Products v. International Union of Operating Engineers, 1996 WL 139249, at *2 (N.D. Ill. March 26, 1996) ("[g]enerally, conclusory assertions that copying costs were necessary are not convincing"); Mortenson v. National Union Fire Ins. Co., 2000 WL 347766 *1 (N.D. Ill. April 3, 2000) (court refused to tax copying costs where it could not ascertain use of copies).

Here, the only documentation which the Best Firm submitted were general descriptions such as "Copy expenses in Wheaton for October." These descriptions do not reflect the purpose for the copies, whether multiple copies were made of the same documents, or what documents were copied, and therefore, do not aid the court in assessing the copying costs. Although the Best Firm is not required to submit a bill of costs "containing a description so detailed as to make

it impossible economically to recover photocopying costs," <u>Northbrook Excess & Surplus Ins.</u> <u>Co. v. Procter & Gamble Co.</u>, 924 F.2d 633, 643 (7th Cir.1991), the Court cannot award photocopying costs without some confidence that the costs are properly recoverable. In the absence of a more detailed affidavit or some other reliable verification that the copying costs were necessary for presenting evidence to this court, the Court declines to tax photocopying costs.

The Best Firm also seeks reimbursement of $2,453.74 for the costs incurred for lodging in Chicago during the trial. While the Court recognizes that travel expenses may be taxed in some instances, it is unreasonable for attorneys who practice in the suburbs to be reimbursed for staying in a hotel in Chicago during trial. Therefore, the Court declines to tax the Village for hotel expenses.

Additionally, the Village objects to several claimed expenses (Def. Exs. G and I) on the grounds that they are part of the Best Firm's overhead and therefore not recoverable. The Court agrees that items such as office supplies are not taxable as costs. Therefore, the Court declines to tax the $1005 in expenses set out in Exhibits G and I in the Village's objections on the grounds that these costs are either too vague or unnecessary to be taxed.

In conclusion, of the $34,307.02 in costs sought by the Best Firm, the Court denies the request for 1,435.34 in copying charges, $2,453.74 in hotel expenses, and $1005 in other costs, and taxes the Village $29,412.94 in costs.

## IV. Motion for Front Pay Damages

Title VII provides that a prevailing plaintiff may obtain both equitable and compensatory remedies. Section 2000e-5(g)(1) authorizes the courts to "order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees,

with or without back pay . . . or any other equitable relief as the court deems appropriate." In construing this provision, courts have found that "front pay damages" are an equitable remedy available under Title VII. See Williams v. Pharmacia, 137 F.3d 944, 951-52 (7th Cir.1998) (front pay damages "fall squarely within the statutory language authorizing 'any other equitable relief'").

Front pay damages are the "functional equivalent of reinstatement because it is a substitute remedy that affords the plaintiff the same benefit (or as close an approximation as possible) as the plaintiff would have received had she been reinstated." Id. at 951. Thus, courts may award front pay damages where reinstatement is not an option because an acrimonious relationship between the plaintiff and her employer renders reinstatement not feasible. Id.

When calculating front pay awards, a court terminates the inquiry at the point at which the plaintiff can "reasonably be expected to have moved on to similar or superior employment." Willams, 137 F.3d at 954. The Seventh Circuit has characterized a front pay award as "a lump sum . . . representing the discounted present value of the difference between the earnings [an employee] would have received in his old employment and the earnings he can be expected to receive in his present and future, and by hypothesis inferior, employment." Downes v. Volkswagen of America, Inc., 41 F.3d 1132, 1141 n. 8 (7th Cir.1994). See also Avitia v. Metropolitan Club of Chicago, Inc., 49 F.3d 1219, 1231 (7th Cir.1995). The Seventh Circuit has stated that in deciding whether to award front pay:

> the court considers such factors as whether the plaintiff has a reasonable prospect of obtaining comparable employment, whether the time period for the award is relatively short, whether the plaintiff intended to work or was physically capable of working and whether liquidated damages have been awarded.

Downes, 41 F.3d at 1141. "An employee receiving front pay in lieu of reinstatement is entitled

to front pay only until such time that the employee can reasonably be expected to have moved on to similar or superior employment." Williams, 137 F.3d at 954.

Although speculative in nature, the longer the period of time for which a front pay award is sought, the more speculative it becomes. McKnight v. General Motors Corp., 973 F.2d 1366, 1372 (7th Cir.1992). See also Williams v. Pharmacia Opthalmics, Inc., 926 F. Supp. 791, 796 (N.D. Ind.1996) ("A [front pay] remedy must be based on events more likely than not to occur, and the existence of future uncertainties have led courts to act cautiously when considering awards of front pay for lengthy periods"), aff'd, 137 F.3d 944 (7th Cir.1998). Front pay is "not intended to insure a plaintiff's future financial success." McKnight, 973 F.2d at 1371. Instead, "[d]amages should ordinarily extend only to the date upon which 'the sting' of any discriminatory conduct has ended." Id.

Here, Mehringer seeks front pay damages in the amount of: (1) $1,068,262 for lost wages and benefits that she would have earned during the next 26 years at the Village if she would not have been constructively discharged (assuming she would have worked until 60 years of age); and (2) $598,500 in lost pension benefits (discounted for present value) she would have earned from retirement (age 60) until age 81.

After examining the above law and the facts of this case, this Court finds that the instant request for front pay damages in the above amounts is unreasonable. Contrary to the Seventh Circuit's succinct pronouncement, that front pay is "not intended to insure a plaintiff's future financial success," McKnight, 973 F.2d at 1371, Mehringer, who left the Village at the age of 34 years of age and has not actively sought work other than a brief stint as a secretary before she gave birth to her first child, seeks front pay for the next 47 years of her life. Moreover, she has failed to offer any competent evidence to show that she suffered any lasting injuries from the

discrimination which would have precluded her from seeking work or is or will be hindered in any way from securing employment in the future. Consequently, not having put forth any competent evidence or calculations for a reasonable award of front pay damages, this Court DENIES Mehringer's Motion for Front Pay Damages.

## CONCLUSION

For the foregoing reasons, this Court:

* Grants the Defendant Village of Bloomingdale's Motion for Summary Judgment and Motion for Directed Verdict as to Count I of the Amended Complaint;

* Grants the Defendant Village of Bloomingdale's Motion to Strike the Punitive Damages Award;

* Grants in part and denies in part Plaintiff Shelly Mehringer's Post-Trial Fee Petition and taxes the Village $289,950 in attorneys' fees and $29,412.94 in costs; and

* Denies Mehringer's Petition for Front Pay Damages.

It is so ordered.

ENTER:

_____
**BLANCHE M. MANNING**
**U.S. DISTRICT COURT JUDGE**

DATE:___ JUN 2 6 2003 _____

